# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA and,<br>PEOPLE OF THE VIRGIN ISLANDS<br><br>v.<br><br>DAMION BELL<br><br>                Defendant. | )<br>)<br>)<br>)   **CRIM. NO.: 10-cr-0050**<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Finch, Senior Judge

      THIS MATTER is before the Court on Defendant Damion Bell's Motion to Suppress. During what the Government contends was a legitimate traffic stop of the car in which Defendant was a passenger, police allegedly discovered a .45 caliber firearm and a magazine containing .45 caliber ammunition. After Defendant was arrested in connection with the firearm and magazine, he allegedly made statements indicating that he owned the .45 caliber firearm. Defendant was charged with felon-in-possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) and unauthorized possession of a firearm in violation of 14 V.I.C. § 2253(a). He now moves to suppress the firearm and his statements on the grounds that they were obtained in violation of his Fourth and Fifth Amendment rights. For the reasons discussed below, the Court denies his motion.

I.     **<u>Findings of Fact</u>**[1]

On the morning of July 6, 2010, the Virgin Islands Police Department ("VIPD") received an anonymous call[2] that there was a firearm inside a black Toyota Scion parked in estate La Grande Princess in St. Croix.  The caller provided the license plate number of the vehicle and indicated that the car was parked in a lot across the street from where an old Nissan dealership had been located.  Officer Ralston Wright received this phone call in a conference room at the police station along with Officers Santos and Marshall.  After receiving this information, Officer Wright was instructed by his sergeant to investigate the tip.

Officers Wright, Santos and Marshall proceeded to La Grande Princess in a marked GMC Envoy with visible police lights on its roof.  They drove to the area described by the caller and located a black Scion matching the caller's description parked in a driveway, the front of the car facing away from the road.  Officer Wright parked the Envoy in a lot across the street from the black Scion and the officers began surveillance.  After approximately fifteen minutes, Officer Wright saw the black Scion pull out from the driveway front first and turn left (right from Officer Wright's perspective) and drive east on Northshore highway, toward the Five Corners intersection.  By the time Officer Wright pulled out to follow the black Scion, one or two cars had passed, so that the Envoy was following one or two cars behind the black Scion.

When the black Scion reached the Five Corners intersection, the VIPD Envoy was directly behind it.  At this time, Officer Wright noticed that there was a passenger in the Scion who appeared to be moving around.  The black Scion continued heading east through the

---

[1] An evidentiary hearing on Defendant's motion was held on June 23-24, 2011.  These findings are based on the testimony of Officer Ralston Wright, Sergeant Dino Herbert, Ariffa Perinon and Defendant Damion Bell as well as the exhibits entered into evidence at the hearing.

[2] Officer Wright stated that the caller was male.

2

intersection and proceeded up the hill, the VIPD Envoy following closely behind. As the black Scion descended down the hill into the Golden Rock area, Officer Wright noticed that the passenger was not wearing his safety belt and engaged the Envoy's emergency lights and sirens.[3] The black Scion pulled over into the visitor's parking lot of, coincidentally, the District Court building. While pulling the black Scion over to the side of the road, Officer Wright called the seatbelt violation in to central dispatch and informed dispatch that he was conducting a traffic stop.

Officer Wright exited the Envoy and proceeded to the driver's side of the Scion; Officer Santos went to the passenger side while Officer Marshall remained standing outside the Envoy. Officer Wright asked the driver, later identified as Ariffa Perinon, to exit the vehicle. She complied. Officer Wright requested her license, registration and proof of insurance. Ms. Perinon indicated that she did not have her license on her person because she had left it at her house, but stated that she did have her registration and proof of insurance. While Ms. Perinon was being questioned by Officer Wright, the passenger, later identified as Defendant Damion Bell, grew agitated and asked Officer Wright if they had been stopped because he had not been wearing his seat belt.[4] Officer Wright replied "Absolutely," but instructed Defendant to calm down. Officer Wright asked Ms. Perinon if there was anything illegal in the car, to which she responded "No." Officer Wright then asked her if he could search the car. Defendant told Ms. Perinon that she should let the police search the car, but she refused to give consent.

---

[3] Officer Wright acknowledged that the rear window of the Scion was tinted, but not enough to obscure his view of the inside the vehicle.
[4] Officer Wright testified that Defendant appeared more concerned about the traffic stop than the driver and that he seemed nervous and in a hurry to get the ticket and go.

3

Officer Wright then asked Defendant for his license. Defendant complied. Officer Wright then instructed Defendant to get out of the vehicle. After repeating his command several more times, Defendant got out of the car. After Defendant got out of the car, Officer Santos asked Defendant to remove his hand from his pocket. He refused. Officer Wright noticed that the "tension" between Officer Santos and Defendant was building and headed to the passenger side of the Scion. As Officer Wright approached Defendant, he instructed him to remove his hand from his pocket. Officer Wright then observed Defendant remove something from his pocket and toss it over the fence surrounding the District Court building. A struggle between Santos, Wright and Defendant ensued. Defendant was subdued. Officer Marshall verbally confirmed to Officer Wright that the object thrown by Defendant was a loaded magazine.

After the magazine was recovered, Officer Wright searched the Scion. He found a loaded .45 caliber firearm in the glove compartment. Officer Wright called in the discovery of the firearm to central dispatch and asked that a forensic technician be sent to the scene of the traffic stop. Both Ms. Perinon and Defendant were then arrested and handcuffed. They were taken to a police station where they were turned over to the detective bureau for questioning.[5]

Sergeant Dino Herbert of the VIPD interviewed Ms. Perinon in the afternoon of July 6, 2010. After being mirandized, Ms. Perinon stated that she was Defendant's girlfriend. She stated that the Scion belonged to her, only she had a key, Defendant did not drive the Scion, and did not have access to it. She denied knowing that there was firearm in her vehicle. She also stated that she did not see Defendant toss an object during the traffic stop.

---

[5] On the way to the station, Defendant allegedly spontaneously stated something to effect of he was nervous because he already had two felonies and did not want to receive a third and go back to prison.

4

Sergeant Herbert also interviewed Defendant in the afternoon of July 6, 2010.[6]  Prior to questioning Defendant, Sergeant Herbert read Defendant his *Miranda* rights from a standard VIPD advice-of-rights form. (*See* Gov. Ex. 1)  Defendant stated that he understood his rights and signed the top section of the form acknowledging that his rights had been read to him and that he understood them.  However, Defendant refused to sign the bottom "WAIVER" section of the form which read:

> I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or force of any king [sic] has been used against me.  I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

(*Id.*)

Despite refusing to sign the waiver section on the advice-of-rights form, Defendant indicated that he was willing to talk to Sergeant Herbert alone about *the traffic stop,* but not about *another incident* that police also wanted to question him about.  During this interrogation, Defendant confessed to Sergeant Herbert that the firearm in the car was his, that he recently got out of prison and dug it up for his protection in the wake of a recent incident.[7]  Defendant stated that he did not want Ms. Perinon, his girlfriend, to get in trouble regarding the firearm.

## II.   Analysis

Defendant seeks to suppress all evidence discovered during the traffic stop as well as the statements allegedly made to Sergeant Herbert.  Defendant contends that Officer Wright lacked probable cause or reasonable suspicion to stop the Scion, and that even if the initial stop was

---

[6] Both Sergeant Herbert and Defendant testified that they knew each other before July 6, 2010. Defendant is friends with Sergeant Herbert's nephew and refers to Sergeant Herbert as "Uncle Dino."  Sergeant Herbert has visited Defendant's house socially on several occasions.

[7] Defendant denied that he asked to speak alone with Sergeant Herbert and that he made any statement about a firearm.

5

lawful, it devolved into an unlawful seizure of Defendant.  Finally, Defendant argues that his alleged confession was obtained after he had invoked his right to remain silent by refusing to sign the waiver portion of the advice of rights form.

### a. The Traffic Stop Was Lawful

"A traffic stop of a motor vehicle is a seizure of the vehicle's occupants for the purposes of the Fourth Amendment." *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "[W]hen a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the government against any occupant of the vehicle unless the government can show that the taint of the illegal stop was purged." *United States v. Mosley*, 454 F.3d 249, 251 (3d Cir. 2006).  However, evidence seized following a traffic stop is admissible so long as, "*at the time of the stop*, the police officer reasonably believed the defendant was committing a traffic offense. . . ." *United States v. Johnson*, 63 F.3d 242, 246 (3d Cir. 1995) (emphasis in original).  In other words, a police officer may lawfully stop a car when he or she has reasonable suspicion to believe that one of its occupants is violating a traffic law.  *Johnson,* 592 F.3d at 447 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *Mosley,* 454 F.3d at 255 n.9 ("A traffic stop requires only reasonable suspicion to believe that a traffic violation has been committed."); *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) ("[A]  traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations.").

Furthermore, an officer does not have to prove that a traffic law was, in fact, being violated, only that he or she possessed specific, articulable facts that an individual was violating a traffic law:

6

> [A] traffic stop will be deemed a reasonable "seizure" when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop. In other words, an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact "does not violate the Fourth Amendment."

*United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006) (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003)).

Here, Officer Wright testified that while following directly behind the Scion, he observed that Defendant was not wearing his seatbelt. His basis for this observation was that when a seatbelt is engaged, part of the strap is normally visible in the gap between the side column and the head of the passenger.[8] Officer Wright testified that he could see that Ms. Perinon's seatbelt was engaged but that Defendant's was not.[9] The Court finds that this was an objectively reasonable basis for the traffic stop. *See* V.I. Code Ann. tit. 20, § 466(b) (2011) ("No person may operate a motor vehicle unless the operator and any passenger in the front seat of the vehicle are restrained by a lap and shoulder restraint where provided by the vehicle manufacturer which crosses over the hip and pelvis."); *United States v. Hanrahan*, 508 F.3d 962, 967 (10th Cir. 2007) (affirming the denial of a suppression motion where the district court found the officer's "testimony credible and therefore determined that the stop was warranted because he had reasonable suspicion that" the defendant had violated a state traffic law), *cert. denied*, 128 S. Ct.

---

[8] On the day of the stop, Officer Wright had eighteen years of law enforcement experience serving with the Virgin Islands, New York, and Atlanta police departments. Officer Wright testified that he had conducted numerous vehicle stops during his tenure as a police officer and that, in his experience, he "can always" see the strap in this manner.

[9] At the hearing, Defendant rigorously contested the fact of whether he was wearing his seatbelt. Both he and Ms. Perinon testified that he was wearing his seatbelt from when he left her house until after the car was pulled over. After observing Officer Wright, Ms. Perinon and Defendant testify; examining photos of the black Scion; reading police reports and affidavits written shortly after the traffic stop, as well as the grand jury testimony of both Officer Wright and Arrifa Perinon, the Court finds Officer Wright's testimony to be credible.

1753 (2008); *see also, United States v. Lewis*, 50 V.I. 366, 372-73 (D.V.I. 2008) (finding that police stop and subsequent discovery of firearm was lawful because "Virgin Islands police officers observed the Defendants in a moving vehicle without wearing their seatbelts").

### b. The Discovery of the Magazine and Firearm Was Lawful

Having established that the initial seizure of Defendant was lawful, the question now faced by the Court is whether the discovery of the magazine or the firearm violated Defendant's Fourth Amendment rights. Defendant's argument on this score is that the traffic stop, even if legitimate at its inception, became unlawful when he was ordered out of the car and surrounded by police officers. The Court finds, however, that the actions of the VIPD officers toward Defendant during the stop were lawful and that discovery of the magazine and firearm did not violate his Fourth Amendment rights.

The Supreme Court "has recognized that traffic stops are especially fraught with danger to police officers . . . The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized. . . if the officers routinely exercise unquestioned command of the situation." *Arizona v. Johnson*, 129 S. Ct. 781, 786 (2009). To that end, a police officer may order a driver and passengers out of a car that has been lawfully stopped. *Maryland. v. Wilson*, 519 U.S. 408, 414 (1997) ("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (noting that the Supreme Court has announced "bright line rule" allowing an

officer to order the driver and passengers out of a lawfully stopped vehicle). Here, consistent with *Mimms* and *Wilson*, Officer Wright ordered both Ms. Perinon and Defendant out of the car shortly after the traffic stop began.

Once Defendant was outside the car, he was instructed to remove his hands from his pockets. After being given this command several times, Defendant removed the magazine from his pocket and threw it over the District Court's fence. Defendant does not specifically allege that this command was unlawful or violative of his Fourth Amendment rights. However, as Defendant argues that the police conduct toward him exceeded the scope of the traffic stop and the command is arguably what lead to the discovery of the magazine, the Court will nonetheless assess whether the command to remove his hands from his pocket was lawful.

In *Wilson*, the Supreme Court balanced the personal liberty of the passenger with the safety of police and held that police may order a passenger out of a car during a traffic stop because "the additional intrusion [over being seized by virtue of the traffic stop] on the passenger is minimal." *Wilson*, 519 U.S. at 415. The Court found that compelling passengers to remain outside the vehicle during a traffic stop was a justifiable (and minimal) intrusion into personal liberty because "[o]utside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment." *Id*. at 414.[10] In

---

[10] In *Wilson*, the Supreme Court noted:
> Regrettably, traffic stops may be dangerous encounters . . . It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver . . . In summary, danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car.

*Id*. at 413-14.

9

*Moorefield*, the Third Circuit applied *Wilson*'s reasoning and held that police may, without any reasonable suspicion, order a passenger in a car to remain in the car and put his hands in the air while the traffic stop is conducted: "Just as the Court in *Wilson* found ordering a passenger out of the car to be a minimal intrusion on personal liberty, we find the imposition of having to remain in the car with raised hands equally minimal. We conclude that the benefit of added officer protection far outweighs this minor intrusion." 111 F.3d at 12-13 (citing *Wilson*, 519 U.S. at 414).

Here, the variation on that theme is that Defendant was already outside of the car when he was instructed to remove his hands from his pocket and show them to police. Nonetheless, the logic of *Moorefield* and *Wilson* applies. The Court reads those cases as standing for the proposition that a traffic stop presents a uniquely dangerous situation to police which justifies minor incursions into the personal liberty of the occupants of stopped vehicles that might not otherwise be appropriate outside the traffic stop context. Just like the vehicles in *Wilson* and *Moorefield* could have contained weapons that their passenger's unseen hands could access, Defendant's pockets could also have contained accessible weapons. In other words, an officer executing a traffic stop is entitled to not only remove the vehicle's occupants, but also make sure that they do not have anything dangerous in their hands. [11] The minimal intrusion on Defendant's liberty of having to remove his hands from his pocket *after* stepping out of the car is substantially outweighed by officer protection. Accordingly, the command to Defendant to remove his hands from his pocket was lawful.[12]

---

[11] Notably, Officer Wright testified that Defendant was given this command because "hands are what hurt people."

[12] The Court in no way means to suggest that police may, without at least reasonable suspicion, order an individual to remove his hands from his pockets outside of the traffic stop context.

10

Furthermore, even if the command to Defendant to remove his hands from his pocket was unshielded by *Wilson* and *Moorefield*, by the time Defendant was ordered to remove his hands from his pocket, the officers had reasonable suspicion that he may have been armed based on his behavior and the anonymous tip they had received only minutes before the stop that a firearm was located inside the black Scion. The details of the tipster's information – the precise location, license plate number, color, make, and model of the car – provided some indication of the tipster's reliability. *See Johnson*, 592 F.3d at 450 (fact that tipster described the color and distinguishing feature of cab into which shooting suspect may entered supported her credibility); *United States v. Nelson*, 284 F.3d 472, 483 (3d Cir. 2002) (detailed information regarding, model, color, and other distinctive characteristics of vehicle supported reliability of information provided by anonymous informant). Furthermore, at the inception of the traffic stop, every single one of these "innocent" details was confirmed by police. *Johnson*, 592 F.3d at 450 (finding that corroboration of location, color, and distinguishing feature of taxicab provided by tipster "enhanced the reliability of the information that she provided to the police."); *United States v. Ritter*, 416 F.3d 256, 272 (3d Cir. 2005) ("The police corroboration of the anonymous tip's innocent details, the cases teach, bolsters the veracity and reliability of the tip. . . .").

Defendant's behavior also contributed to reasonable suspicion. He appeared agitated and in a hurry to leave the traffic stop. *See Wardlow*, 528 U.S. at 120 ("Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion."). Additionally, Defendant required several commands from Officer Wright before getting out of the car. Disobedience of a lawful police order may contribute to reasonable suspicion. *See Moorefield*, 11 F.3d at 14 ("Moorefield's furtive hand movements and refusal to obey the officers' orders constituted suspicious behavior."); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (pat-down

search of passenger upheld, in part because passenger twice disobeyed an order to raise his hands, and also "made furtive movements inside the [vehicle] where his hands could not be seen" (cited with approval in *Moorefield*, 11 F.3d at 14)).

The tip, combined with Defendant's agitated appearance and the fact that it took several commands before he finally exited the vehicle, provided the officers with reasonable suspicion that Defendant may have been armed. *See Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (holding that the test for reasonable suspicion is "one of reasonableness given the totality of the circumstances, which can include [defendant]'s location, a history of crime in the area, [defendant]'s nervous behavior and evasiveness, and [the officer]'s 'commonsense judgments and inferences about human behavior.'" (quoting *Wardlow*, 528 U.S. at 124-25)). While none of these facts are by themselves sufficient, together they provided the police with sufficient reasonable suspicion that Defendant may have been armed.

Having possessed reasonable suspicion that Defendant was armed, the officers were authorized to conduct a pat-down of Defendant, or in this case, to order him to remove his hands from his pocket. *See United States v. Gatlin*, 613 F.3d 374, 379 (3d Cir. 2010) ("During a lawful stop, if the officer 'has reason to believe that he is dealing with an armed and dangerous individual,' he may conduct 'a reasonable search for weapons for the protection of the police officer.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968))). At that point, Defendant removed an object (the magazine) from his pocket and threw it over the District Court's fence. Police then recovered it. Defendant has no reasonable expectation of privacy in an object that he throws from his person to a place accessible to the public. *United States v. Acosta*, 965 F.2d 1248, 1252 (3d Cir. 1992) (finding no reasonable expectation of privacy in common area of apartment building because it was easily accessible my members of the public). Thus, the magazine was

12

not discovered through a search, as that term is used in the Fourth Amendment context, and is therefore not subject to suppression. *See United States v. Hartwell*, 436 F.3d 174, 178 n. 4 (3d Cir. 2006) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001))).

After the officers determined that Defendant had thrown a loaded magazine from his person, the Scion was searched and a .45 caliber firearm was found. The uncontested evidence shows that, prior to the traffic stop, Defendant did not drive the Scion, did not have a key to it and did not have access to it. He had no reasonable expectation of privacy in the Scion and thus no "standing" to contest the search of it. *Rakas v. Illinois*, 439 U.S. 128, 148 (1978) (holding that passengers in car lacked reasonable expectation of privacy in a car they did not own and therefore could not challenge search of vehicle); *United States v. Baker*, 221 F.3d 438, 441-42 (3d Cir. 2000) ("It is clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car." (citing *Rakas*, 439 U.S. at 133-34)).[13] And even if he did have a reasonable expectation of privacy in the Scion sufficient to contest its search, the officers had probable cause to search the vehicle, in light of the partially corroborated tip that a firearm was in the vehicle and the fact that Defendant, who had just been sitting in the car, had just discarded a loaded magazine. *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) ("The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996))).

---

[13] At the hearing, Defendant acknowledged that he lacked standing to contest the search of the car.

### c. Defendant's Statements Are Admissible[14]

Under *Miranda v. Arizona*, prior to a custodial interrogation, a suspect must be advised that, among other things, he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). Failure to give these warnings can result in the suppression of statements made by the suspect in response to police questioning, even if those statements are voluntary. *Michigan v. Mosley*, 423 U.S. 96, 99 (1975).

Once a suspect has been properly warned, police may question him until "the person in custody indicates that he wishes to remain silent." *Id*. at 101 (citations and internal quotations omitted). Recently, the Supreme Court revisited this issue and held that a suspect must "unambiguously" invoke the right to remain silent in order to cut off police questioning. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010). There, a suspect had been properly warned before being interrogated by police for nearly three hours. He remained silent almost the entire time, offering an occasional "yes" or "no" response. *Id.* at 2256. Near the end of the interrogation, he responded to a question and implicated himself in a murder. He moved to suppress the statement on the grounds that his near total silence in the face of police questioning up until that point in the interrogation was effectively an invocation of his Fifth Amendment right to remain silent. *Id.* at 2257. The Court disagreed, holding that the same standard used to

---

[14] Defendant's post-arrest statement made on the way to the police station that he was nervous because he already had two felony convictions was not made in response to police questioning and is therefore not subject to suppression. *See United States v. Calisto*, 838 F.2d 711, 713 (3d Cir. 1988) (finding that defendant's spontaneous "blurt-out" was not made as a result of interrogation); *United States v. Salim*, 2011 WL 337142, at * 4 (D.V.I. Feb. 3, 2011) (finding that statement spontaneously made by defendant in car ride from salon to Immigrations and Customs Enforcement office was not suppressible because "it was not obtained as a result of interrogation and is therefore not subject to *Miranda's* exclusionary rule." (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987) and *Rhode Island v. Innis*, 446 U.S. 291, 303 (1980))).

determine whether a suspect has invoked his right to counsel, announced in *Davis v. United States*, 512 U.S. 452, 459 (1994), should be applied to invocation of the right to remain silent:

> If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights . . . there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*.

*Thompkins*, 130 S. Ct. at 2259-60 (quoting *Davis*, 512 U.S. at 461-62). The Court feared that if it found otherwise, "police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong. . . . Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." *Id.* at 2260 (citations and internal quotations omitted).

Here, Defendant contends that his refusal to sign a written waiver form was tantamount to an invocation of his right to remain silent. Although an interesting argument, Defendant's refusal to sign is not the sort of unambiguous invocation required by *Thompkins*. Just like the suspect in *Thompkins*, Defendant "did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning. Here he did neither, so he did not invoke his right to remain silent." *Id*. at 2260. Even though Defendant refused to sign the waiver section of the advice-of-rights form, he stated that he was willing to talk to Sergeant Herbert alone. This put Sergeant Herbert in a dilemma – should he avoid questioning Defendant because of his refusal to sign the waiver or should he honor Defendant's request to speak with him in private?

The Court believes this is precisely the sort of ambiguous response that *Thompkins* found to be insufficient to invoke the right to remain silent.[15]

Finally, the Court finds Defendant voluntarily waived his right to remain silent. Defendant was read his *Miranda* rights. It is uncontested that Defendant understood them. After receiving his *Miranda* warning, Defendant voluntarily chose to speak with Sergeant Herbert. Nothing more is required to establish a waiver. *Thompkins*, 130 S. Ct. at 2262 ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").

---

[15] In a pre-*Thompkins* decision, *United States v. Plugh*, 576 F.3d 135 (2d Cir. 2009), the Second Circuit found that a suspect's refusal to sign a similar waiver form was an unequivocal waiver of his right to remain silent: "By unequivocally refusing to sign the waiver form in response to a custodial agent's instruction to sign the waiver form if defendant agreed with it, defendant in this case invoked his Fifth Amendment rights, and therefore his custodial agents were required to refrain from further interrogation." *Id.* at 137. The Court finds *Plugh* unpersuasive for four reasons. First, there are significant, albeit subtle, differences between the facts here and in *Plugh*. Here, the Defendant refused to sign and then immediately indicated that he wished to speak to Sergeant Herbet. In *Plugh*, the defendant refused to sign and did not then immediately express a desire to talk. *Id.* at 138.
    Second, it is unclear whether *Plugh* survives *Thompkins*. *Plugh* distinguished *Davis* – which *Thompkins* essentially extended to cover the right to remain silent – on the grounds that "*Davis* only provides guidance for circumstances in which a defendant makes a claim that he subsequently invoked previously waived Fifth Amendment rights." *Id.* at 143. However, the Supreme Court made no such distinction in *Thompkins* and applied *Davis* to the question of whether Thompkins had invoked his right to remain silent in the first instance.
    Third, *Plugh*'s holding converts presentation of an advice-of-rights form into a situation where the default response – leaving it blank – is an invocation of the right to remain silent. While there is a presumption that a suspect has not waived his right to remain silent (*North Carolina v. Butler*, 441 U.S. 369, 373 (1979)), holding that an unsigned waiver is an affirmative invocation of the right creates too high of a barrier to police questioning of a suspect and tilts the field too far away from the public's interest in prosecuting criminal activity.
    Finally, *Plugh*'s holding might have the unintended consequence of discouraging police from using these types of forms, relying instead on purely oral warnings, resulting in significantly more arguments over whether a suspect was adequately warned. Use of advice-of-rights forms ensure that a suspect is properly warned and provides some evidence that the warning were, in fact, given. Their use should not be discouraged.

16

### III.　Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress. Accordingly, it is hereby **ORDERED** that

Defendant's Motion to Suppress is **DENIED**.

**ENTERED**:

Dated: June 30, 2011

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE